UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

_____

WANDA COTE,

             Plaintiff,

v.                                          Docket No. 24-CV-336-AJ

JUSTINE MERCED, JOSHUA STEVENS, JESSIE
HAMLIN, CHRISTOPHER ROTHWELL, AND
CHIEF WADE PARSONS,

             Defendants.

_____

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

NOW COME the defendants, Justine Merced, Joshua Stevens, Jesse Hamlin, Christopher Rothwell, and Chief Wade Parsons (each a "Defendant," and collectively, the "Defendants"), by and through their attorneys Morrison Mahoney LLP, and do hereby submit this Memorandum of Law in Support of their Motion to Dismiss.

## I. INTRODUCTION

This case arises out of the execution of a warrant at the residence of Plaintiff Wanda Cote on December 8, 2021, by members of the Danville Police Department. During its execution, Plaintiff alleges that Defendant Justine Merced unreasonably struck Plaintiff with a door causing her pain and discomfort, and thereafter "paraded" her nude in front of male officers, including Defendants Joshua Stevens, Jessie Hamlin, Christopher Rothwell, and Chief Wade Parsons. Plaintiff asserts constitutional claims pursuant to 42 U.S.C. § 1983 for excessive force (Count I),

unreasonable seizure (Count III), failure to intervene (Count V), and malicious prosecution (Count VI), allegedly leading to humiliation, emotional distress, and physical pain.

Defendants move to dismiss under Rule 12(b)(6) because the Complaint fails to present facts that sufficiently allege any Defendant violated a clearly established constitutional right or engaged in conduct that meets the threshold for a constitutional violation. This includes, but is not limited to, that certain other Defendants violated Plaintiff's constitutional rights by failing to intervene in the alleged conduct of Officer Merced (Count V). Therefore, Defendants are entitled to qualified immunity as a matter of law.  Even if qualified immunity does not apply, or cannot be determined on the pleadings, Counts I, III, V, and/or VI still must be dismissed because they fail to state a claim upon which relief can be granted under 42 U.S.C. § 1983 as to all or some of the defendants. The Court should then abstain from the exercise of supplemental jurisdiction over Plaintiff's remaining state-law claims, Counts II (Common Law Assault) and IV (Intentional Infliction of Emotional Distress).

## II. FACTUAL BACKGROUND

### a. Allegations in Plaintiff's Complaint

The facts relevant to this motion are as follows and are taken from Plaintiff's Complaint. On the morning of April 10, 2020, Dr. Stephen Crawford, the State Veterinarian, contacted the Danville Police Department ("Danville PD") regarding health certificates for Plaintiff Wanda Cote's pets. (Pl. Compl ¶ 7). Dr. Crawford informed Danville PD that Mrs. Cote was not licensed by the state and was allegedly in violation of RSA 437:8. (Pl. Compl. ¶ 8). Following an investigation, Officer Justine Merced obtained a search warrant on August 3, 2020, to investigate whether the Cotes were selling puppies without proper licensing (Pl. Compl. ¶ 10).

On December 8, 2021, Defendant Merced, accompanied by Defendants Joshua Stevens, Jessie Hamlin, Christopher Rothwell, and Chief Wade Parsons, executed the search warrant at the Cotes' residence. (Pl. Compl. ¶ 17). Plaintiff had just showered and was wrapped only in a towel when she heard a knock at the door and commands from Defendant Merced. (Pl.'s Compl. ¶ 20). Defendant Merced insisted that Plaintiff be placed in hand restraints. (Pl.'s Compl. ¶ 21). Plaintiff tried to cover herself, but Defendant Merced slammed Plaintiff against a wall with a door. (Pl.'s Compl. ¶ 22). Once secured, Plaintiff was then escorted ***out of her*** bedroom and ***down the stairs*** "in front of the warrant execution team while still naked." (Pl.'s Compl. ¶ 23). Defendant Stevens and Defendant Hamlin witnessed Defendant Merced "parading" Plaintiff through the house but did nothing to intervene. (Pl.'s Compl. ¶ 24). "At least one" male officer made comments about Plaintiff's body. (Pl.'s Compl. ¶ 25). Plaintiff's husband Charles Cote returned home and was permitted by Defendant Merced to assist Plaintiff in dressing herself. (Pl.'s Compl. ¶ 26). Defendant Merced thereafter initiated criminal charges against Plaintiff. (Pl.'s Compl. ¶ 27).

**b.  <u>Allegations from Police Reports</u>**

The following facts are taken from a police report authored by Defendant Officer Joshua Stevens, attached hereto as Exhibit A, which documents Plaintiff Wanda Cote's arrest during the execution of a search warrant at her residence on December 8, 2021.

On December 8, 2021, at approximately 0916 hours, Chief Wade Parsons, Lieutenant Justine Merced, Sergeant Jessie Hamlin, Officer Christopher Rothwell, and Officer Joshua Stevens arrived at 6 Cote Drive, Danville, New Hampshire, to execute multiple warrants (Exhibit A at 1). Officer Stevens positioned himself by the front door on the right side of the residence, while Sergeant Hamlin and Lieutenant Merced positioned themselves at the left-side door (Exhibit A at

1). Lieutenant Merced knocked on the door, and soon after, Plaintiff approached and opened the door while wearing a bath towel (Exhibit A at 1).

Lieutenant Merced informed Plaintiff that officers were executing a search warrant for the residence and an arrest warrant for her person (Exhibit A at 1). Plaintiff responded that there was nothing at her residence and that she had been arrested previously (Exhibit A at 1). Lieutenant Merced and Officer Stevens then instructed Plaintiff to retrieve clothing and get dressed (Exhibit A at 1). Plaintiff first stated that she had no clothing and called Lieutenant Merced "an idiot" (Exhibit A at 1). Plaintiff then attempted to close the door on officers and moved into the mudroom area, at which point Lieutenant Merced, Sergeant Hamlin, and Officer Stevens stepped inside and instructed her that she could not close the door (Exhibit A at 1).

Plaintiff then began shouting and attempting to call her husband, Charles Cote, despite being told that it was not the time for phone calls (Exhibit A at 1). Officers instructed Plaintiff to put the phone down, but Plaintiff continued dialing her husband's number and physically resisted when Officer Stevens reached for the phone (Exhibit A at 1). Officer Stevens then secured the phone, handing it to Sergeant Hamlin (Exhibit A at 1). Plaintiff then reiterated that she was in a towel and that officers were attempting to arrest her while she was in a towel (Exhibit A at 1). Officer Stevens again instructed Plaintiff to retrieve clothing (Exhibit A at 1). Plaintiff stated that she would get dressed and opened the door leading into the main house (Exhibit A at 1). She then attempted to immediately close the door behind her (Exhibit A at 1). Officer Stevens pushed the door open and informed Plaintiff that she would need to be accompanied because she was the subject of an arrest warrant (Exhibit A at 1).

Plaintiff then walked upstairs to the second floor of the residence (Exhibit A at 1). She entered a bedroom and attempted to close the door behind her (Exhibit A at 1). Lieutenant Merced

pushed the door open and told Plaintiff that the door needed to remain open (Exhibit A at 1). Plaintiff then began shouting that the officers were attempting to arrest "a naked lady" (Exhibit A at 1). Lieutenant Merced, Sergeant Hamlin, and Officer Stevens then instructed Plaintiff to get herself dressed (Exhibit A at 1). The three officers exited the room and waited in the hallway, outside of the bedroom and outside of immediate view (Exhibit A at 1). However, Plaintiff was heard attempting to use a telephone, as indicated by an audible dial tone (Exhibit A at 1). Lieutenant Merced then re-entered the room and secured the phone (Exhibit A at 1). Officers then exited the room again, out of immediate view (Exhibit A at 1).

Moments later, officers heard Plaintiff shouting (Exhibit A at 1). Lieutenant Merced and Officer Stevens re-entered the room and observed Plaintiff yelling out an open bedroom window (Exhibit A at 1). Lieutenant Merced advised Plaintiff that she was under arrest and instructed her to get dressed (Exhibit A at 1). Plaintiff then threw off her towel and stated that she was not getting dressed (Exhibit A at 1). Officer Stevens then secured Plaintiff in hand restraints (Exhibit A at 1).

After being placed in hand restraints, Lieutenant Merced handed Officer Stevens a blanket, which he placed over Plaintiff's shoulders to cover her (Exhibit A at 2). Shortly after, Charles Cote arrived and was allowed upstairs at Lieutenant Merced's direction due to his calming effect on Plaintiff (Exhibit A at 2). Charles assisted Plaintiff in getting dressed while officers remained outside the room and out of view (Exhibit A at 2).

Once dressed, Plaintiff and Charles walked downstairs as instructed, with Officer Stevens following (Exhibit A at 2). Plaintiff walked into a bathroom, where she brushed her hair and asked if she could brush her teeth (Exhibit A at 2). Plaintiff was then transported to the jail for processing, after which she was released on bail.

### III. STANDARD OF REVIEW

5

### a.  Legal Standard of Review Under Rule 12(B)(6)

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). (internal quotations and citation omitted). "[W]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id*. Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 327 (1st Cir. 2016) (quoting Iqbal, 556 U.S. at 678, 129 S. Ct. 1937). "Bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (quoting *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937).

The Court must "accept the well pleaded factual averments of the complaint as true and construe these facts in the light most favorable to the [plaintiff]," *Chongris v. Board of Appeals*, 811 F.2d 36, 37 (1st Cir. 1987), but should not "credit bald assertions, unsupportable conclusions, and opprobrious epithets woven into the fabric of the complaint." *In re Colonial Mortgage Bankers Corp.*, 324 F.3d. 12, 15 (1st Cir. 2003) (internal quotations and citation omitted).  "[A] plaintiff … [is] required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 15 (1988).

### b.  Legal Standard of Review for Considering Documents Not Attached to the Complaint

Though courts are normally unable to consider documents or material outside of the complaint without converting a motion into one for summary judgment, Fed. R. Civ. P. 12(d), there are narrow exceptions that allow this Court to consider Mr. Dunn's rental Agreement.  *See*

*Alternative Energy, Inc. v. St. Paul Fire and Marine Ins., Co.*, 267 F.3d 30, 34 (1st Cir. 2001) (holding that district court properly considered settlement agreement when ruling on motion to dismiss because existence of defendant's potential liability depended directly on whether claims had been released under settlement agreement and plaintiff did not dispute the settlement agreement's authenticity). Those exceptions are exceptions "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Hogan v. E. Enters./Bos. Gas*, 165 F. Supp. 2d 55, 58 (D. Mass. 2001); *see also Foley v. Wells Fargo Bank*, 772 F.3d 63, 74 (1st Cir. 2014). As the First Circuit has repeatedly recognized, "where a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged),' then the court can review it upon a motion to dismiss." *Alt. Energy, Inc.*, 267 F.3d at 34 (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998)).

In this case, Exhibit A is a police report authored by Defendant Officer Joshua Stevens, documenting Plaintiff's arrest in connection with the execution of the search warrant on December 8, 2021. This document directly pertains to Plaintiff's federal constitutional claims under 42 U.S.C. § 1983, including excessive force (Count I), unreasonable seizure (Count III), failure to intervene (Count V), and constitutional malicious prosecution (Count VI)—all of which Defendants now move to dismiss. The Complaint describes the sequence of events surrounding Plaintiff's arrest, including her allegations of mistreatment at the hands of Defendant Merced and the presence of the other officers at the scene. *See* (Pl.'s Compl. ¶¶ 7-29).

Although the Complaint does not explicitly cite the police report by name, it is evident that Plaintiff's allegations are based on and intertwined with the events documented within. Exhibit A provides critical factual context regarding the execution of the warrant, the circumstances of

7

Plaintiff's arrest, and the actions—or alleged inactions—of each named Defendant. It serves as a contemporaneous record of the Defendants' locations, actions, and observations during the warrant execution, and thus is highly relevant in evaluating whether Plaintiff's § 1983 claims meet the plausibility standard under Rule 12(b)(6). Given that (1) the report is central to Plaintiff's allegations concerning the officers' conduct and the execution of the warrant, and (2) Plaintiff's Complaint implicitly references the circumstances documented in the report, the Court should consider Exhibit A.

## IV.    **ARGUMENT**

All federal claims against the Defendants, including Merced, should be dismissed on grounds of qualified immunity because Plaintiff has not demonstrated that any alleged conduct violated a clearly established constitutional right. The doctrine of qualified immunity protects government officials from liability unless their actions were so clearly unlawful that every reasonable officer would have understood them as unconstitutional. Here, Plaintiff has not identified any precedent that places Defendants on clear notice that their conduct—whether in executing the search warrant, effectuating Plaintiff's arrest, or allegedly failing to intervene—was unlawful under the specific circumstances alleged. At most, the Complaint asserts conclusory claims that officers engaged in unconstitutional conduct without establishing that their actions violated clearly established law. Because Plaintiff has not met her burden to overcome qualified immunity, dismissal is warranted.

Moreover, Exhibit A contradicts Plaintiff's assertions regarding both Defendant Merced's alleged use of force and the involvement of the other Defendants, further demonstrating that Plaintiff's allegations fail to meet the plausibility standard under Rule 12(b)(6). While the Complaint alleges that Defendant Merced used excessive force by slamming a door into Plaintiff

and parading her naked in front of officers, the police reports document a different series of events—showing that officers repeatedly allowed Plaintiff opportunities to get dressed, provided her with a blanket for coverage, and permitted her husband, Charles Cote, to assist her in dressing. The reports further establish that Plaintiff, on multiple occasions, moved through different areas of the home, attempted to close doors on officers, and threw off her own towel, contradicting any suggestion that she was intentionally exposed by officers. Additionally, officers did not rush the arrest or use undue aggression; rather, they waited outside the bedroom while Plaintiff dressed and only reentered when she attempted to use a phone despite instructions not to. These facts directly counter Plaintiff's claims of excessive force, unreasonable seizure, and failure to intervene, reinforcing that her allegations amount to bald assertions unsupported by specific facts. Because the Complaint relies on conclusory allegations that are contradicted by the documented facts, it fails to state a claim under Rule 12(b)(6), and dismissal of all federal claims is warranted.

Because Plaintiff's claims are both legally barred by qualified immunity and factually deficient, dismissal of all federal claims against all Defendants is required.

### a. <u>The Officers are Entitled to Qualified Immunity</u>

The Defendants are entitled to qualified immunity because Plaintiff has failed to establish that their conduct violated a clearly established constitutional right. The doctrine of qualified immunity shields government officials performing discretionary functions from liability unless their actions violate statutory or constitutional rights that were clearly established at the time of the alleged misconduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This protection extends beyond a defense to liability—it is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The Supreme Court has emphasized that qualified

9

immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To determine whether qualified immunity applies, courts employ a two-prong analysis: (1) whether the plaintiff has alleged facts showing a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts retain discretion to address either prong first, depending on the circumstances of the case. *Id.* at 236.

For a right to be clearly established, it must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). This standard ensures that government officials are not held liable for "mistaken judgments," *Hunter v. Bryant*, 502 U.S. 224, 229 (1991), but are instead accountable only for transgressions following "fair warning" that their conduct deprived the alleged victim of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). Importantly, the inquiry must be particularized to the facts of the case. *White v. Pauly*, 580 U.S. 73, 79 (2017). General principles of constitutional law are insufficient; there must be precedent that places the specific conduct in question "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Once a defendant raises qualified immunity, the burden shifts to the plaintiff to show that the official violated a clearly established right. *Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir. 1997).

In the instant case, Plaintiff has failed to overcome the significant protection of qualified immunity because she has neither alleged a constitutional violation nor shown that any such right was clearly established at the time of the alleged misconduct. Plaintiff asserts claims of excessive force, unreasonable seizure, failure to intervene, and malicious prosecution but fails to identify

any case law demonstrating that the specific actions attributed to Defendants violated a clearly established constitutional right.

With respect to Count I, the excessive force claim, Plaintiff has not established that any of Defendant Merced's alleged conduct was unconstitutional under clearly established law at the time of the incident. Plaintiff alleges that Defendant Merced used excessive force by slamming a door into her and restraining her, but Exhibit A contradicts these assertions, showing that officers provided Plaintiff multiple opportunities to comply, gave her a blanket for coverage, and allowed her husband to assist in dressing her. Even assuming *arguendo* that Lieutenant Merced's actions involved some level of force, Plaintiff fails to cite binding precedent holding that such conduct— during the execution of a lawful search and arrest warrant—constitutes a Fourth Amendment violation. Without such, Plaintiff has not met her burden to overcome qualified immunity as to Count I.

With respect to Count III, the unreasonable seizure claim, Plaintiff does not dispute that Defendants were executing a valid search and arrest warrant. Courts have consistently held that the use of some degree of force to effectuate an arrest does not, by itself, constitute a Fourth Amendment violation unless the force used was objectively unreasonable under clearly established law. See *Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding that "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"). The Fourth Amendment's reasonableness standard requires courts to consider the totality of the circumstances, including the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is actively resisting or attempting to evade arrest. See *Scott v. Harris*, 550 U.S. 372, 383 (2007). Furthermore, to overcome qualified immunity, Plaintiff must identify precedent that clearly establishes that the

specific conduct at issue—under materially similar circumstances—constitutes a constitutional violation. See *Pauly*, 580 U.S. at 73 (holding that "clearly established law must be particularized to the facts of the case"). Here, Plaintiff fails to allege facts establishing that the force used—if any—was objectively unreasonable in violation of clearly established law. The Complaint does not assert that officers struck, physically assaulted, or used any weapons against Plaintiff beyond the alleged door incident involving Lieutenant Merced. Moreover, Exhibit A contradicts Plaintiff's characterizations of events, showing that she resisted officers' instructions, attempted to close doors on them, disregarded commands, and moved throughout the residence before being secured. Plaintiff has not identified any precedent holding that the minimal force alleged in these circumstances constitutes an unreasonable seizure, and without such authority, she has failed to overcome the protections of qualified immunity.

Plaintiff's failure to intervene claim, Count V, similarly fails under qualified immunity, as she does not allege facts demonstrating that any of the officers—apart from Lieutenant Merced—had knowledge of excessive force or a realistic opportunity to intervene. The Complaint does allege that Officer Stevens was present during portions of the arrest and that Sergeant Hamlin was inside the residence, but it does not specify Hamlin's location at critical moments, particularly when Plaintiff entered her bedroom and was allegedly restrained. Additionally, the Complaint is devoid of allegations placing Defendants Rothwell or Parsons anywhere inside the residence at the time of the alleged force, making it implausible that they could have intervened. Exhibit A further contradicts any inference that officers had an opportunity to intervene, as it demonstrates that Plaintiff moved throughout different areas of the home, resisted commands, and attempted to close doors on officers. Courts have consistently held that an officer cannot be liable for failure to intervene unless they were both aware of the misconduct and had the ability to prevent it. See

12

*Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990). Because Plaintiff fails to plead facts establishing where each officer was at the time of the alleged force or that they had a realistic opportunity to intervene, qualified immunity bars her failure to intervene claim.

Plaintiff's malicious prosecution claim, Count VI, also fails under qualified immunity, as she has not alleged that any Defendant initiated criminal proceedings against her without probable cause in violation of clearly established law. Courts have consistently held that the existence of a valid arrest warrant undermines a malicious prosecution claim. See *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 100 (1st Cir. 2013) (holding that a malicious prosecution claim requires a showing of no probable cause). Plaintiff has not identified any precedent establishing that executing an arrest warrant pursuant to a lawful search constitutes malicious prosecution, and she has therefore failed to overcome qualified immunity.

Because Plaintiff has not met her burden of demonstrating that Defendants violated clearly established law under any of her § 1983 claims, qualified immunity applies, and dismissal of Counts I, III, V, and VI is required.

### b. **Plaintiff Fails to State a Claim Due to Factual Insufficiency.**

The allegations in Plaintiff's Complaint are factually insufficient to support a plausible claim for relief. Plaintiff asserts constitutional claims under 42 U.S.C. § 1983, yet fails to allege sufficient facts to show that any Defendant engaged in unconstitutional conduct. Her failure to intervene claim, Count V, relies entirely on the presence of Defendants Stevens, Hamlin, Rothwell, and Parsons at the scene, without alleging their specific actions or inactions that violated any duty to intervene. The Complaint does not describe where these officers were situated during the alleged misconduct by Lieutenant Merced or how they could have observed her actions. Similarly, Plaintiff's allegations regarding excessive force, Count I, unreasonable seizure, Count III, and

malicious prosecution, Count VI, are contradicted by Exhibit A which documents a materially different sequence of events than what Plaintiff alleges.

Plaintiff's allegations regarding excessive force, unreasonable seizure, and malicious prosecution fail to meet the pleading standard under Rule 12(b)(6) because they are conclusory and contradicted by the detailed factual record in Exhibit A. While the Complaint asserts that Lieutenant Merced used excessive force by slamming a door into Plaintiff and parading her naked before officers, Exhibit A demonstrates a materially different sequence of events, showing that Plaintiff moved throughout her home, attempted to close doors on officers, disregarded commands, and, at one point, removed her own towel. The police report further documents that officers provided Plaintiff multiple opportunities to get dressed, gave her a blanket for coverage, and permitted her husband, Charles Cote, to assist her in dressing. These details contradict any assertion that officers intentionally humiliated her or unreasonably escalated force. At no point does Exhibit A suggest that Lieutenant Merced or any other officer used physical force beyond what was necessary to execute a lawful arrest warrant.

Similarly, Plaintiff's unreasonable seizure claim fails because she does not plead facts demonstrating that her arrest—pursuant to a valid warrant—was unconstitutional. Exhibit A details that Plaintiff initially resisted arrest by refusing to comply with officers' instructions, attempted to make phone calls despite being told not to, and physically moved away from officers during the arrest process. Rather than immediately restraining her, officers allowed Plaintiff to retrieve clothing and even removed her handcuffs to facilitate dressing, contradicting any claim that her arrest was carried out with excessive or unreasonable force. Plaintiff does not allege that Defendants lacked probable cause, used objectively unreasonable force beyond Lieutenant Merced's alleged actions, or deviated from lawful arrest procedures.

14

Her malicious prosecution claim is equally deficient, as she does not allege that Lieutenant Merced fabricated evidence, withheld exculpatory information, or improperly influenced the decision to prosecute her. See *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 100 (1st Cir. 2013). Exhibit A further undermines this claim, as it confirms that Plaintiff's arrest was based on an active warrant, and there is no indication that Lieutenant Merced or any other officer engaged in misconduct related to the initiation or continuation of charges.

Because Plaintiff's claims rely on vague and generalized assertions rather than well-pleaded facts, Exhibit A is appropriately considered, as it documents the same events Plaintiff describes and is central to her allegation, *See Watterson v. Page,* 987 F.2d 1, 4 (C.A.1 (N.H.),1993). As Exhibit A contradicts Plaintiff's claims by providing a more complete account of the incident, as the Complaint fails to state a plausible claim for relief as to Plaintiff's excessive force, unreasonable seizure, and malicious prosecution claims.

To establish a failure to intervene claim under § 1983, a plaintiff must allege facts showing that (1) a constitutional violation was committed by another officer; (2) the defendant-officer knew of the violation; (3) the defendant-officer had a realistic opportunity to prevent the harm; and (4) the defendant-officer failed to intervene. *See Gaudreault*, 923 F.2d at 207 n.; *see also Martinez v. Colon*, 54 F.3d 980, 985 (1st Cir. 1995). Plaintiff's allegations fail to meet these elements for several reasons. First, the Complaint does not establish where each officer was located at the time of the alleged force or show that any of them had the ability to intervene. Although it asserts that Officer Stevens was present at times during the arrest and Sergeant Hamlin was inside the residence, it does not specify Hamlin's location when Plaintiff entered her bedroom and was allegedly restrained. Additionally, the Complaint is devoid of allegations placing Defendants Rothwell or Parsons anywhere inside the residence at the time of the alleged force, making it

implausible that they could have intervened. Exhibit A further contradicts any inference that officers had an opportunity to intervene, as it demonstrates that Plaintiff moved throughout different areas of the home, resisted commands, and attempted to close doors on officers, making it unclear when or how any officer—other than Lieutenant Merced—could have intervened. Because Plaintiff fails to plead facts establishing where each officer was at the time of the alleged force or that they had a realistic opportunity to intervene, dismissal of Count V is warranted.

In sum, Plaintiff's Complaint relies on bald assertions rather than specific factual allegations that, if true, would establish plausible constitutional violations. Courts do not accept conclusory allegations as sufficient to survive a motion to dismiss, particularly when they are embedded in legal conclusions. *See Iqbal*, 556 U.S. at 678. Fairness dictates that claims unsupported by specific factual allegations should not proceed past the pleading stage, especially when the incorporated record refutes the allegations in material ways.

Because Plaintiff has failed to plead facts that plausibly establish a constitutional violation, her claims must be dismissed under Rule 12(b)(6).

**c.** **The Court Should Decline to Exercise Supplemental Jurisdiction Over the Remaining State-Law Claims.**

Because all federal claims (Counts I, III, V, and VI) are subject to dismissal, this Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims, Counts II (Common Law Assault) and IV (Intentional Infliction of Emotional Distress). Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it had original jurisdiction. Courts routinely recognize that when no federal claims remain, dismissal of pendent state-law claims is appropriate. *See Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008) (noting that if a plaintiff "has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise

16

supplemental jurisdiction over the pendent state-law claims"). Similarly, the Supreme Court has stated that when all federal claims are eliminated before trial, the balance of factors—judicial economy, convenience, fairness, and comity—typically favors dismissal of state claims without prejudice. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988). Given that no federal issues remain, the Court should follow this well-established principle and dismiss the remaining state-law claims.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court dismiss all federal claims (Counts I, III, V, and VI) against all Defendants for failure to state a claim under Rule 12(b)(6). Plaintiff has not alleged sufficient facts to establish a constitutional violation, and Exhibit A contradicts the Complaint's material allegations, demonstrating that Defendants acted lawfully and reasonably in executing the search and arrest warrant. Additionally, Defendants are entitled to qualified immunity, as Plaintiff has failed to identify any clearly established law placing Defendants on notice that their actions violated her constitutional rights. Finally, because no federal claims remain, the Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims (Counts II and IV) under 28 U.S.C. § 1367(c)(3).

104020635.v1

Respectfully submitted,

JUSTINE MERCED, JOSHUA STEVENS,
JESSE HAMLIN, CHRISTOPHER
ROTHWELL, AND CHIEF WADE PARSONS

By Their Attorneys,

MORRISON MAHONEY LLP

Date: January 31, 2025          By     /s/ RJ Meurin
                                       _____
                                       William N. Smart, #18357
                                       wsmart@morrisonmahoney.com
                                       RJ Meurin, #266219
                                       rmeurin@morrisonmahoney.com

                                       Center of New Hampshire Office Tower
                                       650 Elm Street, Suite 201
                                       Manchester, NH 03101

                                       Phone:        603-622-3400

                                       Fax:          603-622-3466

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served to all counsel of record via ECF.

                                       /s/ RJ Meurin
                                       _____
                                       RJ Meurin, #18357

18

# Exhibit A

```
               Danville Police Department
          NARRATIVE FOR PATROL JOSHUA 143-STEVENS
              Ref: 21DAN-109-AR

     Entered:  12/08/2021 @ 1026      Entry ID: 4095
     Modified: 01/07/2022 @ 1704   Modified ID: 4095
     Approved: 01/12/2022 @ 1339   Approval ID: 6687
```

On December 8, 2021, I was assigned to patrol in the Town of Danville, New Hampshire in cruiser #2. At approximately 0916 hours, Chief Parsons, Lieutenant Merced, Sergeant Hamlin, Officer Rothwell and I served an multiple warrants for a female identified as **Wanda Cote (DOB:** ▓▓▓▓▓▓ **)** and for her residence, located at **6 Cote Drive** in **Danville**. On arrival to 6 Cote Drive, Lt. Merced notified Rockingham County Dispatch all units would be out. I took position by the front door on the right side of the residence, while Sergeant Hamlin and Lt. Merced were positioned at the door on the left side of the residence. Lt. Merced knocked on the door and shortly thereafter, informed me Wanda was approaching the door.

As I walked over, Wanda opened the door in a bath towel and asked what we wanted. Lt. Merced informed Wanda we were executing a search warrant for her residence and an arrest warrant for her. Wanda said there was nothing at the residence and after she had been arrested previously. Lt. Merced and I advised Wanda she needed to get dressed and Lt. Merced asked her if she had some clothing to put on. Wanda looked intently at Lt. Merced and initially said she "had no clothing" and then told Lt. Merced she was "an idiot". Wanda then attempted to close door as she moved back into the mudroom area. Lt. Merced, Sgt. Hamlin and I stepped inside and informed Wanda she could not close the door on us. Wanda raised her voice and stated she was calling "Chuck", who was her husband, a male identified as **Charles Cote (DOB:** ▓▓▓▓▓▓ **)**. Both Lt. Merced and I told Wanda it was not the time for phone calls. Wanda picked up her phone and was told to put it down. Wanda dialed Charles's number and when I reached for the phone, she moved her hand away from me to keep me from securing it. Wanda was informed again it was not the time for phone calls and I secured phone from Wanda and handed it to Sgt. Hamlin. Wanda then stated she was in a towel, and we were trying to arrest her in a towel. I asked Wanda to look at me and told her she did not know me, and I was there to serve a warrant only, and I requested she retrieve some clothing to wear. I also informed Wanda if she chose not to put clothing on, she would be arrested in a towel and she needed to decide what she wanted to do. Wanda said she would get some clothing and opened the door into the main house. Wanda attempted to close the door immediately behind her as she walked into the house. I pushed the door open and informed Wanda she would be accompanied because she had an arrest warrant.

Wanda walked up the stairs leading to the second floor, and while doing so made multiple comments regarding Lt. Merced and the Danville Police Department. When Wanda opened the door to her bedroom, she immediately attempted to close it behind her. Lt. Merced pushed the door open and told Wanda the door needed to remain open. Wanda began yelling that we were trying to arrest a naked lady. Lt. Merced, Sgt. Hamlin, and I both advised Wanda to get dressed. Wanda began yelling that we wanted to watch a 60-year-old woman get dressed. Lt. Merced, Sgt. Hamlin and I then waited in the hallway outside of the bedroom, outside of immediate view of Wanda. Shortly thereafter, I heard a phone being dialed and entered room along with Lt. Merced and observed Wanda had dialed a landline phone and was attempting to make a call. Lt. Merced secured phone and Wanda was told to get dressed again. Lt. Merced and I then returned to the hallway outside the bedroom, out of immediate view of Wanda. Shortly thereafter, Wanda was heard yelling that we were "attempting to watch her get dressed". Lt. Merced and I entered the room and observed Wanda sticking her head into an open bedroom window and yelling. Lt. Merced informed Wanda she was under arrest and needed to get dressed. Wanda then threw the towel off and said that she was not getting dressed. I informed Wanda she was under arrest. I took hold of Wanda's right wrist with my right hand and told her to put her hands behind her back.

Danville Police Department

NARRATIVE FOR PATROL JOSHUA 143-STEVENS
Ref: 21DAN-109-AR

Entered: 12/08/2021 @ 1026        Entry ID: 4095
Modified: 01/07/2022 @ 1704       Modified ID: 4095
Approved: 01/12/2022 @ 1339       Approval ID: 6687

Wanda pulled away from me and attempted to move towards the bedroom door. I advised Wanda to stop and placed my left hand on her left shoulder. I guided Wanda away from the doorway and informed her to stop resisting. Wanda attempted to pull her right arm again and then relaxed. I proceeded to handcuff her, double lock the cuffs and check for proper fit. While Wanda was moving around, Lt. Merced handed me a large blanket which I placed over Wanda's shoulders, so it completely covered the backside of her body and Wanda remained facing away from me.

Shortly thereafter, Charles arrived on-scene and walked upstairs. I was informed by Lt. Merced to allow him into the room because he had a calming effect on Wanda. Charles spoke to Wanda and said he would help her get dressed. At the request of Lt. Merced, I removed the handcuffs and remained in the hallway while Charles assisted Wanda getting dressed. While getting dressed, Wanda continued to make multiple comments that we were watching her get dressed and we wanted to see her naked. Once dressed, I instructed Charles to walk down the stairs first, with Wanda to follow. Wanda and Charles did so, and I followed down the stairs. I instructed Wanda to walk out the front door because it was less steps to the cruiser, and she ignored me and continued walking to the bathroom. Wanda brushed her hair and then asked if she could brush her teeth. Sergeant Hamlin informed Wanda she would be back later in the day and to come out of the bathroom. I instructed Wanda to exit the bathroom as well. Wanda then walked over to her pocketbook, and I informed her she did not need to take that, and she said, "Oh I can't zip it up?" in a loud, and what I interpreted to be sarcastic tone. I instructed Wanda to walk outside, and she exited the residence through the mudroom. I escorted her to my cruiser and told her to place her hands behind her back, which she did. I handcuffed Wanda, double locked the cuffs and checked for proper fit. Wanda said she was not riding in the back of my cruiser because she would "get car sick". I informed her that was the only option and opened the door to the rear passenger compartment, which I had checked for contraband at the beginning of my shift and found to be clean. Wanda turned to sit down, and I placed my arm under her shoulder to assist her. Once Wanda was seated, she complained the seat hurt her hands, and I advised her to place her hands in the open part of the seat which was designed for people who were handcuffed.

Wanda leaned forward and then back, causing her hands to push against the hard seat without placing them into the area of the seat I specified. Wanda repeated the action three additional times. I directed Wanda to move her upper body to the left or right to find the open part of the seat for her hands to fit into. I assisted Wanda when she loudly said she could not find it. I then seat belted Wanda. I notified Dispatch I would be enroute to their facility. Sergeant Hamlin got into the passenger seat and accompanied me for the transport. I provided **starting miles 98177** and **ending miles 98186**. On arrival to the jail, I pulled into the garage bay, and secured my duty weapon in the provided lock box. Jail personnel spoke to Wanda in the rear passenger compartment of my cruiser, and once they were done, Wanda was retrieved from my cruiser and instructed to sit in the provided seat. When I moved to assist Wanda out of the cruiser, she yelled that I had "touched her enough", and she would get out on her own.

Wanda got out of my cruiser and walked to the seat and was instructed to remain seated. Jail personnel removed her handcuffs and returned them to me. Wanda complained she was going to be car sick and stood up multiple times after being instructed not to. Wanda was asked if she wanted the services of a bail commissioner and Wanda said she did. **Bail Commissioner St. James** was called and requested to respond to the jail. Wanda's pertinent information was obtained. While asking her booking questions, Wanda raised her voice and told me, "I would be sorry" and she was going to "sue". I advised Wanda I only needed her to answer my booking questions.

Danville Police Department
NARRATIVE FOR PATROL JOSHUA 143-STEVENS
Ref: 21DAN-109-AR

```
Entered: 12/08/2021 @ 1026      Entry ID: 4095
Modified: 01/07/2022 @ 1704   Modified ID: 4095
Approved: 01/12/2022 @ 1339   Approval ID: 6687
```

Wanda was subsequently escorted inside by jail personnel for fingerprinting, and was accompanied by Sergeant Hamlin, who completed the booking process. I remained in the garage bay.

Wanda received a court date of, and was charged with:

**Brentwood District Court on February 8, 2021 @ 0815 hours**

**Breach of Bail Conditions x2**

Respectfully Submitted,

_____

Officer Stevens
Patrol #143